IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| **LAUREN A. TINSLEY**,<br> *Plaintiff,*<br><br>*v.*<br><br>**TENNESSEE HIGHWAY PATROL, JOSHUA BUCKNER, EION ROHRBAUGH, MATT PERRY JIMMIE JOHNSON III, ERIC MILLER**<br> *Defendants.* | **Case No.**<br><br><br>**JURY DEMANDED** |

## COMPLAINT

Comes now the Plaintiff, Lauren A. Tinsley, by undersigned counsel and for her complaint against the Defendants states the following:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter under 28 U.S.C. § 1331 with this Complaint arising under a violation of rights conferred by the Constitution of the United States of America.

2. Jurisdiction of this Court is invoked under 28 U.S.C. § 1343(a)(3) because this action seeks redress for a deprivation, under color of state law, of rights secured to Plaintiff by the Fourth Amendment to the Constitution of the United States of America.

3. Plaintiff asserts claims for relief under 42 U.S.C. § 1983, which authorizes action to redress the deprivation, under color of state law, of rights, privileges, or immunities secured to her by the Constitution or laws of the United States; under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132 et seq.; and under 42 U.S.C.

Case 3:26-cv-00943     Document 1     Filed 07/07/26     Page 1 of 30 PageID #: 1

§ 1988, which authorizes the award of attorney's fees and costs to prevailing plaintiffs in actions brought under 42 U.S.C. § 1983 and Title II of the ADA.

4.    Each of Ms. Tinsley's constitutional claims arises under the Fourth Amendment to the United States Constitution, made applicable to the states and state actors through the Fourteenth Amendment to the United States Constitution.

5.    This Court is a proper venue for this action pursuant to 28 U.S.C. § 1391(b)(1) because one or more defendants reside in this judicial district. Additionally, this Court is presiding over a related case, *Engle et al v. Tennessee Highway Patrol et al*, USDC MDTN No. 3:26-cv-00555 (alleging similar ADA and § 1983 claims against THP and individual troopers arising from DUI arrests of sober drivers).

## PARTIES

6.    Plaintiff Lauren A. Tinsley is an adult resident of Morgan County, Tennessee.

7.    Defendant Joshua Buckner was at all relevant times a Trooper in the Tennessee Highway Patrol ("THP") assigned to District 1. He is sued in his individual capacity.

8.    Defendant Eion Rohrbaugh was at all relevant times a Trooper in the THP assigned to District 1 and a certified Advanced Roadside Impaired Driving Enforcement ("ARIDE") instructor. He is sued in his individual capacity.

9.    Defendant Matt Perry was at all relevant times the Colonel of the THP and the agency's executive head. He is sued in his individual capacity.

10.    Defendant Jimmy Johnson III was at all relevant times a Lieutenant

Colonel in the THP whose oversees the Training Division across all eight THP districts. He is sued in his individual capacity.

11.     Defendant Eric Miller was at all relevant times a Captain in the THP who commanded the entire Knoxville District (District 1) of the Tennessee Highway Patrol, which includes Blount County. He is sued in his individual capacity.

12.     Defendant Tennessee Highway Patrol is a division of the Tennessee Department of Safety and Homeland Security and is a "public entity" under 42 U.S.C. § 12131(1). The THP is named as a defendant only for the Title II ADA claim asserted in Claim V. Congress has abrogated state sovereign immunity for such claims. 42 U.S.C. § 12202.

FACTUAL ALLEGATIONS

13.     Ms. Tinsley is thirty-two years old and has no criminal history of any kind.

14.     Ms. Tinsley is employed as a facilities custodian at the Y-12 National Security Complex in Oak Ridge, Tennessee, where she is enrolled in and certified under the federal Human Reliability Program ("HRP"). The HRP is codified at 10 C.F.R. Part 712.

15.     The HRP is one of the most rigorous fitness-for-duty regimes in the federal government, applying to personnel with access to sensitive nuclear materials and classified national-security information at DOE and NNSA facilities, including Y-12.

16.     As an HRP-certified individual, Ms. Tinsley is subject to an annual medical assessment, continuous fitness evaluation, mandatory medication disclosure, random drug and alcohol testing, and Department of Energy personnel security review.

3

17. Ms. Tinsley has been diagnosed with attention-deficit/hyperactivity disorder ("ADHD") since childhood, for which she has taken a prescribed daily 36 mg dose of methylphenidate hydrochloride extended-release (sold under the brand name Concerta) for approximately fifteen years.

18. Ms. Tinsley's ADHD is a recognized disability under the Americans with Disabilities Act. 42 U.S.C. § 12102; 29 C.F.R. § 1630.2.[1]

19. Ms. Tinsley has also been diagnosed with convergence insufficiency ("CI"), a vision condition affecting eye tracking.

20. Ms. Tinsley is also prescribed sertraline hydrochloride (sold under the brand name Zoloft) to manage anxiety associated with her ADHD. Zoloft is an FDA-approved antidepressant and is not a controlled substance.

21. Both of Ms. Tinsley's prescription medications have been disclosed to and approved by federal occupational medical authorities.

22. The federal Site Occupational Medical Director and federal psychology personnel cleared Ms. Tinsley to operate a motor vehicle and to perform her safety-critical duties at Y-12 while taking both prescribed medications.

23. Y-12's random drug testing has repeatedly confirmed her fitness for duty notwithstanding the presence of methylphenidate at her prescribed dose.

24. On the morning of Saturday, August 2, 2025, Ms. Tinsley left her home en route to a charity golf tournament sponsored by her Y-12 employer.

---

[1] 29 C.F.R. § 1630.2(j)(1)(i)–(ix); EEOC, *29 C.F.R. § 1630.2 — Definitions*, https://www.ecfr.gov/current/title-29/subtitle-B/chapter-XIV/part-1630/section-1630.2 (last accessed May 25, 2026).

25. She had slept only approximately five hours. She was running late.

26. That morning, Ms. Tinsley took her prescribed dose of Concerta. She had not eaten breakfast. She had consumed only coffee.

27. Ms. Tinsley had consumed no alcohol and had not taken any other prescription medication that morning, including her Zoloft.

28. At approximately 7:48 a.m. on Pellissippi Parkway, Tpr. Buckner observed Ms. Tinsley's vehicle drift onto the right shoulder on one occasion and initiated a traffic stop, ostensibly for failure to maintain lane under Tenn. Code Ann. § 55-8-123.

29. Tpr. Buckner had been a sworn Tennessee Highway Patrol Trooper for approximately three to four months at the time of the stop.

30. During the stop, Ms. Tinsley immediately and openly disclosed: that she had not consumed any alcohol; that she had not eaten and only had coffee that morning; that she has ADHD; that she takes a prescribed dose of Concerta for her ADHD; that she had taken her Concerta approximately fifteen minutes before the stop; that she also has a Zoloft prescription, but she had not taken Zoloft that day; that she had been in a car accident in March 2025 that injured her left side; that she had only slept five hours the night before; and that she is employed at the Y-12 National Security Complex in the federal Human Reliability Program, where federal medical personnel had cleared her to drive while taking these prescribed medications.

31. Both prescription bottles were in plain view on her passenger seat, with the Zoloft bottle unopened. Ms. Tinsley produced her Concerta bottle when asked.

32. Ms. Tinsley's disclosures of her ADHD diagnosis, her prescription

5

medications, and the timing of her morning dose placed Tpr. Buckner on actual notice of a recognized neurodevelopmental disability under federal law.

33. Ms. Tinsley exhibited no signs of intoxication: no odor of alcohol, no bloodshot or glassy eyes, no slurred speech, no stumbling or swaying. She was cooperative and forthcoming throughout, though visibly nervousness about the encounter's potential impact on her clearance and employment.

34. The two prescription medications Ms. Tinsley disclosed at the roadside are among the most commonly prescribed medications in the United States.

35. Tpr. Buckner called for backup. Tpr. Rohrbaugh, an ARIDE-certified instructor, arrived on scene approximately five minutes later.

36. Tpr. Buckner demonstrated that he did not know what either medication was, and that he did not know the difference between them.

37. When Tpr. Rohrbaugh asked Tpr. Buckner for the pharmaceutical name for Concerta, Tpr. Buckner answered: "Methamphetamine, metal dam, something like that."

38. Concerta is not methamphetamine. Its generic name is methylphenidate.

39. In addition to being listed in the publicly available reference sheet provided by the D.E.A., methylphenidate is identified in the NHTSA DRE Participation Manual.

40. Tpr. Rohrbaugh later searched the internet for information on Concerta.

41. Tpr. Buckner admitted on body camera that he could not reliably tell which of Ms. Tinsley's prescribed medications was a stimulant and which was a depressant.

42. Although Tpr. Buckner and Tpr. Rohrbaugh repeatedly referred to Zoloft

6

as a "depressant" throughout the encounter, Zoloft is not a depressant.

43. Tpr. Rohrbaugh stated "[Zoloft] can definitely impair. Sertraline is very impairing, even in controlled doses." This statement was false.

44. The FDA-approved Zoloft prescribing information states expressly that sertraline "does not demonstrate . . . abuse potential."[2]

45. The Tennessee Bureau of Investigation does not test for sertraline (Zoloft) in routine DUI blood sample analysis because it is not impairing in therapeutic doses.[3]

46. Despite Ms. Tinsley's repeated disclosure that she had not taken Zoloft that morning, and despite the unopened bottle on her seat, Tpr. Rohrbaugh told Tpr. Buckner "Zoloft would be the one I'm concerned about."

47. Tpr. Buckner and Tpr. Rohrbaugh built their arrest theory in part Horizontal Gaze Nystagmus ("HGN") and Lack of Convergence ("LOC") indicators during the eye tests they administered, neither of which is produced by CNS stimulants such as the Concerta Ms. Tinsley disclosed taking.[4]

48. Before administering field sobriety tests, Tpr. Buckner repeatedly assured Ms. Tinsley that if she had taken only her prescribed Concerta, she "should be good."

49. Tpr. Buckner volunteered that Concerta was, in his words, "like my

---

[2] Pfizer Inc., *Zoloft (sertraline hydrochloride) Prescribing Information*, U.S. Food and Drug Administration (2023), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2023/019839s102,020990s059lbl.pdf (last accessed May 25, 2026)

[3] Tennessee Bureau of Investigation, Forensic Services / Toxicology Unit, *Toxicology Drug List*, https://www.tn.gov/content/dam/tn/tbi/documents/Toxicology%20Drug%20List.pdf (last accessed May 25, 2026)

[4] California Highway Patrol, *DRE Drug Category Symptomology Matrix*, https://www.chp.ca.gov/siteassets/files/symptomology-matrix.pdf (last accessed May 25, 2026); IACP, *The 7 Drug Categories*, https://www.theiacp.org/7-drug-categories (last accessed May 25, 2026).

Adderall" (his own prescribed CNS stimulant) and that he was "not worried" about it.

50. In reliance on those assurances, Ms. Tinsley consented to sobriety testing.

51. Throughout the encounter, Tpr. Rohrbaugh repeatedly stated to Tpr. Buckner variations on the theme that Ms. Tinsley was on a "great combo" of medications.

52. Ms. Tinsley had disclosed, and the prescription bottles on her seat confirmed, that she had taken only one of the two medications that morning. There was no "combo" in her system.

53. Concerta and Zoloft are commonly co-prescribed, and neither drug's FDA-label contraindicates concurrent use.[5]

54. Without reasonable suspicion of intoxication, solely on the basis of Ms. Tinsley's voluntary disclosure that she had taken prescribed medication, Tpr. Buckner initiated a series of field sobriety tests against Ms. Tinsley.

55. Tpr. Buckner administered the Horizontal Gaze Nystagmus (HGN) test without any of the required preliminary steps, and performed three of the four components incorrectly.

56. Body camera footage captured Tpr. Buckner demonstrating that he did not understand the distinction between "distinct" and "sustained" nystagmus, two adjectives that together define the validating clues for the HGN test.

57. Tpr. Rohrbaugh acknowledged on body camera that "stimulants wouldn't show [LOC] anyway," and that what they observed was not "distinct and sustained

---

[5] Drug Interactions between Concerta and Zoloft, Drugs.com, https://www.drugs.com/drug-interactions/concerta-with-zoloft-1606-976-2057-1348.html?professional=1 (last accessed June 15, 2026)

nystagmus" attributable to drug-induced nystagmus.

58. The swaying Tpr. Buckner described is not recognized as a clue, is not visible on body camera footage, and the affidavit contains no measurement of the sway.

59. Tpr. Buckner's narrative scores two out of six HGN clues, suggesting a BAC below the legal limit, a finding inapplicable in any event as HGN is not a recognized indicator for CNS stimulants such as Concerta.

60. Tpr. Rohrbaugh administered a second HGN test where he likewise failed to complete any of the pre-test requirements and incorrectly performed components.

61. Tpr. Buckner administered the Walk-and-Turn test without completing any of the required pre-test inquiries.

62. Tpr. Buckner incorrectly reported that Ms. Tinsley broke the heel-to-toe stance three times. Body camera footage shows this occurring a maximum of twice.

63. Each of the four clues Tpr. Buckner attributed to Ms. Tinsley on the Walk-and-Turn test is either procedurally invalid, contradicted by body camera footage, or a direct consequence of Tpr. Buckner's own deficient instruction.

64. Tpr. Buckner reported in his narrative that Ms. Tinsley took ten steps instead of the instructed nine. Body camera footage shows Ms. Tinsley taking nine steps.

65. Tpr. Buckner next administered the One-Leg Stand test and acknowledged that he "didn't see clues."

66. Tpr. Buckner identified two "indicators" in his reports. Neither indicator is among the four NHTSA-validated clues for the One-Leg Stand, and both are explained by Tpr. Buckner's own deficient instructions.

67. Tpr. Buckner identified slow counting as an indicator of intoxication despite NHTSA guidance that CNS stimulant impairment is associated with rapid, not slow counting.

68. Tpr. Rohrbaugh then administered additional ARIDE tests.

69. Ms. Tinsley completed the Modified Romberg test twice within the allotted tolerance, and Tpr. Rohrbaugh expressly acknowledged that she was "in that window of performing sufficiently."

70. Tpr. Rohrbaugh also administered the Finger-to-Nose (FTN) test. The affidavit's characterizations of Ms. Tinsley's performance are unsupported by body camera footage, and the required documentation diagram was never produced.

71. Ms. Tinsley disclosed multiple innocent explanations for her demeanor and test performance, as listed in ¶33. Tpr. Buckner and Tpr. Rohrbaugh failed to consider any of these explanations and failed to modify or adjust their interpretation of the field sobriety tests to account for these disclosures.

72. After Tpr. Buckner and Tpr. Rohrbaugh completed the field sobriety testing, Tpr. Buckner asked Tpr. Rohrbaugh where he "would be at" with respect to whether Ms. Tinsley was impaired. Tpr. Rohrbaugh responded "I can't answer that."

73. Tpr. Buckner made the decision to arrest and placed Ms. Tinsley under arrest for Driving Under the Influence.

74. The facts readily available to Tpr. Buckner and Tpr. Rohrbaugh would not have led any reasonable officer to believe that Ms. Tinsley was "under the influence" as defined by Tenn. Code Ann. § 55-10-401.

75. Tpr. Buckner transported Ms. Tinsley to Blount Memorial Hospital for a blood draw to be conducted pursuant to a search warrant.

76. Tpr. Buckner prepared an Affidavit and Application for Search Warrant and swore it before a Blount County Judicial Commissioner.

77. The Affidavit and Application for Search Warrant contained material false statements and material omissions, including:

a) Stating that Ms. Tinsley "performed HGN and missed multiple clues." Tpr. Rohrbaugh had expressly stated on body camera that what they observed was not "distinct and sustained nystagmus," and "does not necessarily equate to drug induced nystagmus";

b) stating that Ms. Tinsley was "swaying during the HGN test," when swaying is not an HGN clue and not visible on body camera footage;

c) stating that Ms. Tinsley "missed multiple clues" on the Walk-and-Turn test without identifying which of the eight NHTSA-validated clues Tpr. Buckner observed, and the only deviation captured on body camera was the instructional-stance foot reversal that she immediately corrected;

d) acknowledging that Ms. Tinsley "did not miss any [NHTSA-validated] clues" on the One-Leg Stand, while presenting the non-validated observation (counting to 15) as evidence of impairment;

e) omitting that Ms. Tinsley passed the Modified Romberg test twice within the validated tolerance, as Tpr. Rohrbaugh acknowledged;

f) stating that Ms. Tinsley "was unable to perform the lack of convergence

11

test," without disclosing her convergence insufficiency or that CNS stimulants do not produce lack of convergence as a validated indicator;

g) mischaracterizing Ms. Tinsley's Finger-to-Nose performance, omitting that arm movement variation is not a validated clue, that body tremors are not visible on camera, that erratic eye movement cannot be observed during the test as the subject's eyes are closed, and that the claimed misses were not properly documented;

h) omitting Ms. Tinsley's contemporaneously disclosed innocent explanations for her demeanor; and

i) invoking blood intoxicant language when Tpr. Buckner had acknowledged less than an hour earlier he did not know the active ingredient of Ms. Tinsley's medication and could not reliably distinguish stimulants from depressants.

78. A Blount County Judicial Commissioner issued a Search Warrant authorizing the seizure of Ms. Tinsley's blood based on the affidavit. Ms. Tinsley's blood was drawn at Blount Memorial Hospital pursuant to the Search Warrant.

79. Tpr. Buckner then transported Ms. Tinsley to the Blount County Jail, where she was processed and booked.

80. She was subjected to the mandatory four-hour hold following her arrest.

81. In fact, Ms. Tinsley was held for approximately seven hours.

82. Ms. Tinsley had to surrender her personal effects, was photographed for a mug shot, fingerprinted, subjected to a strip change, and held in a holding cell during

12

the seven-hour booking process.

83. Ms. Tinsley posted bond through Tennessee Bonding Company. Her family paid $250 in non-refundable bond fees to the bondsman.

84. Tpr. Buckner separately prepared an Affidavit of Complaint and swore it before a Blount County Judicial Commissioner.

85. The Affidavit of Complaint contained false material statements and material omissions consistent with those in the Affidavit and Application for Search Warrant.

86. Without Tpr. Buckner's false statements and material omissions, the Affidavit of Complaint did not establish probable cause to believe that Ms. Tinsley was driving under the influence in violation of Tenn. Code Ann. § 55-10-401.

87. Relying on the false and misleading Affidavit of Complaint, a Blount County Judicial Commissioner found probable cause and issued an Arrest Warrant charging Ms. Tinsley with DUI, First Offense, in violation of Tenn. Code Ann. § 55-10-401, and with Driving on Roadways Laned for Traffic in violation of Tenn. Code Ann. § 55-8-123.

88. On August 12, 2025, THP submitted Ms. Tinsley's blood sample to the TBI's Knoxville Crime Laboratory for testing.

89. On September 5, 2025, the TBI confirmed no alcohol was detected.

90. On February 13, 2026, the TBI issued an Official Toxicology Report for Ms. Tinsley's blood sample confirming no basic drugs, opiates, buprenorphine, cannabinoids, cocaine, barbiturates, benzodiazepines, methamphetamine, oxycodone, fentanyl, or

oxymorphone detected.

91.     On February 19, 2026, the District Attorney for the 5th Judicial District of Tennessee filed a Motion Not to Prosecute Ms. Tinsley's case. Both charges against Ms. Tinsley were dismissed by nolle prosequi, and the Blount County General Sessions Court entered an Order for the Expungement under Tenn. Code Ann. § 40-32-101.

92.     As a direct result of the arrest and the subsequent criminal proceedings, Y-12 immediately pulled Ms. Tinsley's badge and paused her HRP clearance. For approximately four weeks following the arrest, Ms. Tinsley was suspended from her position pending an internal review and a Y-12-administered drug test.

93.     Upon her return to work approximately four weeks after the arrest, Ms. Tinsley was barred from the secure areas of Y-12. For approximately six months she did not receive the five-percent pay differential associated with her clearance.

94.     As a further condition of returning to work, Ms. Tinsley was required to complete approximately 14 hours of online alcohol and drug-abuse education classes, subjected to supervised random drug testing which requires a Y-12 official to physically observe Ms. Tinsley provide a urine sample in a bathroom.

95.     Ms. Tinsley was subjected to this supervised drug testing on multiple occasions and experienced it as humiliating, invasive, and degrading.

96.     The arrest, prosecution, and pendency of the criminal charges caused Ms. Tinsley significant and ongoing fear, anxiety, and emotional distress.

97.     Ms. Tinsley experiences anxiety when she observes a THP vehicle on the road and has, on multiple occasions, telephoned her mother for reassurance after seeing

a state trooper while driving, even in her own neighborhood.

98. Ms. Tinsley incurred substantial out-of-pocket costs as a result of the arrest, including approximately $7,500 in fees paid to criminal defense counsel and $250 in non-refundable bond-bondsman fees.

99. On or about October 27, 2025, WSMV Channel 4 investigative journalist Jeremy Finley published a report titled *Former Tennessee Troopers Say DUI Quotas Led to Arrest of Sober Drivers*.

100. In that report, two former THP troopers stated that the THP had implemented an internal system that pressures troopers to make as many DUI arrests as possible, regardless of probable cause or actual impairment.

101. During her on-camera interview, former Trooper Ashley Smith stated "[t]his is corruption . . .We are being forced to ruin people's lives."

102. Reporter Jeremy Finley also obtained and released an audio recording of THP Captain Patrick Turner instructing troopers to "arrest every DUI that you can get your hands on," the he was "passing on the message of what the command staff wants," that "hard work" meant "arresting a hundred plus DUIs a year," and that troopers producing low arrest numbers would "get spanked."

103. An internal email circulated by THP Captain Bruce McCarley earlier in 2025 with the subject line "DUI Map" displayed every county in District 8 and listed each trooper's name alongside a number corresponding to their number of DUI arrests.

104. Former Troopers Smith and Potts confirmed the email conveyed that troopers with lower numbers were "not doing good enough" and needed to "do better."

105. Both former troopers stated that THP troopers were incentivized to make DUI arrests because higher arrest numbers resulted in "premium overtime."

106. The TBI publicly reported that, of the 16,883 blood samples it processed in 2024, 419 came back with zero alcohol or other intoxicants detected: 419 drivers who had been arrested on DUI charges that the State's own laboratory could not substantiate.

107. Subsequent reporting indicated that, since 2017, more than 2,500 Tennesseans have faced DUI charges despite testing negative for any substances.

108. Upon information and belief, Tpr. Buckner has personally arrested other sober individuals for DUI whose subsequent blood tests returned negative for alcohol and controlled substances prior to August 2, 2025.

109. Tpr. Buckner's and Tpr. Rohrbaugh's conduct mirrors a recurring pattern among THP officers who have relied on non-validated field tests, subjective impressions, and incorrect categorizations of prescribed medications to arrest sober drivers without objective indicators of impairment.

110. At all times relevant to the Complaint, Col. Perry served as the Colonel and commanding officer of the Tennessee Highway Patrol, with direct command authority over the agency's eight districts, its operations, and its personnel, including Tpr. Buckner and Tpr. Rohrbaugh.

111. Lt. Col. Johnson personally directed THP's statewide field operations across all eight districts and, at all relevant times, oversaw the agency's Training Division. His command responsibilities included reviewing troopers' performance measures each month, monitoring the districts' impaired-driving enforcement activity,

and reviewing disciplinary matters.

112. Capt. Eric Miller commanded the Knoxville District (District 1) of the THP, which includes Blount County, and was responsible for the training, supervision, and evaluation of Tpr. Buckner and Tpr. Rohrbaugh.

113. Capt. Miller personally created, maintained, and circulated the Knoxville District's monthly enforcement plans and the district's "DUI maps"—documents that tracked and compared troopers by their number of DUI arrests. Capt. Miller also received and reviewed the Knoxville District's monthly "Trooper Analytics" reports, which measured each trooper's individual productivity and identified troopers— including Tpr. Buckner and Tpr. Rohrbaugh—whose stop and arrest numbers were deemed deficient.

114. Through the DUI maps and Trooper Analytics reports, THP districts— including the Knoxville District—ranked and compared troopers against one another by their DUI-arrest numbers, identified troopers with low numbers as deficient, directed them to "do better," and warned them of adverse consequences, including being "spanked," if their DUI-arrest numbers did not improve.

115. Before August 2, 2025, Col. Perry, Lt. Col. Johnson, and Capt. Miller each knew that this quota-driven enforcement culture was causing troopers under their command to arrest drivers for DUI without probable cause, including sober drivers whose blood tests returned negative for alcohol and drugs. Among other things, THP's Office of Professional Accountability had, in 2024, investigated and disciplined a trooper—by reassignment and a ten-day suspension—for arresting drivers who were

later cleared by toxicology testing, and other THP troopers had been sued or investigated for the same conduct.

116. Upon information and belief, before and on August 2, 2025, Col. Perry, Lt. Col. Johnson, and Capt. Miller each knew that THP's quota-driven enforcement practices were pressuring the troopers under their command to make DUI arrests even in cases without probable cause, and each knew that troopers were: disregarding disability, prescription-medication, recent-injury, and other innocent explanations for perceived field-sobriety-test performance; omitting exculpatory evidence from affidavits; failing to credit the absence of objective indicators of intoxication; and arresting drivers for impairment by common prescription medications whose active ingredients the arresting troopers could not correctly identify and which TBI does not test for in routine DUI blood analysis. Each of them nevertheless authorized, encouraged, or knowingly acquiesced in these practices.

117. Col. Perry, Lt. Col. Johnson, and Capt. Miller each knew that the troopers under his command were not equipped to distinguish common prescription medications—including widely prescribed stimulants and antidepressants—from impairing drugs, and knew that troopers were treating a driver's disclosure of such medications as evidence of impairment. Despite that knowledge, each failed to ensure that the troopers under his command were trained or corrected.

118. THP had already recognized the need to train troopers on stimulants, depressants, and prescription medications. Col. Perry, Lt. Col. Johnson, and Capt. Miller nevertheless failed to ensure that the troopers under their command—including Tpr.

18

Buckner and Tpr. Rohrbaugh—received or applied that training on or before August 2, 2025.

119. An untrained trooper who encounters a driver's disclosure of a prescribed medication during a DUI stop will misidentify the disclosure as evidence of intoxication and arrest a sober, law-abiding driver, as occurred here.

120. Capt. Miller directly supervised Tpr. Buckner and Tpr. Rohrbaugh and tracked their enforcement activity through the Knoxville District's monthly Trooper Analytics reports. Upon information and belief, Capt. Miller knew of prior DUI arrests by Tpr. Buckner of drivers who later tested negative for alcohol or controlled substances, yet took no corrective action and instead continued to press the troopers under his command to increase their DUI-arrest numbers.

121. Col. Perry and Lt. Col. Johnson were aware, through THP's internal reporting and disciplinary mechanisms, that troopers were arresting sober drivers for DUI, including through the Office of Professional Accountability's investigation and discipline of a trooper in 2024 for such arrests. Despite that knowledge, they failed to investigate, discipline, retrain, or otherwise correct the troopers engaged in wrongful DUI arrests, and allowed the quota-driven practices to continue.

122. In authorizing, encouraging, or knowingly acquiescing in these practices despite their knowledge, Col. Perry, Lt. Col. Johnson, and Capt. Miller each acted with deliberate indifference to the substantial and obvious risk that troopers under their command would seize and arrest sober, law-abiding drivers—such as Ms. Tinsley— without probable cause.

123. As a foreseeable result of these supervisory acts and omissions, drivers—and Ms. Tinsley in particular—were subjected to arrest without probable cause, malicious prosecution, and the other harms alleged in this Complaint.

124. The wrongful arrest and malicious prosecution Ms. Tinsley suffered were the direct and proximate result of the personal acts and omissions of Col. Perry, Lt. Col. Johnson, and Capt. Miller described above.

## CLAIM I: 42 U.S.C. § 1983 — UNLAWFUL ARREST IN VIOLATION OF THE FOURTH AMENDMENT
### (*Tpr. Buckner and Tpr. Rohrbaugh*)

125. The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, guarantees the right to be free from unreasonable seizures, including arrest without probable cause.

126. On August 2, 2025, Tpr. Buckner and Tpr. Rohrbaugh seized Ms. Tinsley and arrested her for DUI without probable cause.

127. At the time of the arrest, the facts known to Tpr. Buckner and Tpr. Rohrbaugh would not have led any reasonable officer to believe that Ms. Tinsley was under the influence of any intoxicant or controlled substance, or drug as defined by Tenn. Code Ann. § 55-10-401.

128. Tpr. Buckner and Tpr. Rohrbaugh further ignored or failed to document exculpatory evidence.

129. Tpr. Buckner directly violated Ms. Tinsley's Fourth Amendment rights by effecting the arrest without probable cause.

130. Tpr. Rohrbaugh directly violated Ms. Tinsley's Fourth Amendment rights

by participating in the field sobriety investigation, coaching Tpr. Buckner to the arrest decision, and joining in the arrest as the senior, ARIDE-certified officer on scene.

131. In the alternative, and to the extent the trier of fact concludes that he did not himself effect the arrest, Tpr. Rohrbaugh is liable for failure to intervene.

132. Tpr. Rohrbaugh observed every field sobriety test in real time, expressly recognized on body camera that: the eye-test indicators were not "distinct and sustained nystagmus," that stimulants do not produce Lack of Convergence, and that Ms. Tinsley was "performing sufficiently" on the Modified Romberg test.

133. Tpr. Rohrbaugh had the opportunity and the duty to prevent the arrest which he knew lacked probable cause. He did not intervene.

134. Tpr. Buckner and Tpr. Rohrbaugh acted under color of law by using and abusing the authority and power of their positions as THP Troopers to seize and arrest Ms. Tinsley, in violation of her Fourth Amendment rights and in furtherance of THP's quota-driven DUI enforcement objectives without lawful basis.

135. As a direct and proximate result of the wrongful arrest, Ms. Tinsley suffered emotional distress, reputational harm, public embarrassment, threats to her federal employment and security clearance, physical loss of liberty, and financial losses.

**CLAIM II: 42 U.S.C. § 1983 — MALICIOUS PROSECUTION IN VIOLATION OF THE FOURTH AMENDMENT**
**(*Tpr. Buckner and Tpr. Rohrbaugh*)**

136. Tpr. Buckner instituted and continued criminal proceedings against Ms. Tinsley for violation of Tenn. Code Ann. § 55-10-401 and Tenn. Code Ann. § 55-8-123 by swearing out the Affidavit of Complaint and the Affidavit and Application for Search

Warrant before a Blount County Judicial Commissioner, and Tpr. Rohrbaugh influenced that decision by coaching Tpr. Buckner toward the arrest and supplying the impairment theory the affidavits relied on.

137. Both affidavits contained material false statements and material omissions made with knowledge of their falsity or with reckless disregard for the truth.

138. The reckless disregard standard is satisfied independently by the fact that the impairment theory Tpr. Buckner advanced in the affidavits, that Ms. Tinsley's disclosed CNS stimulant medication caused the indicators he described, is directly contradicted by NHTSA training materials. An officer who swears to an impairment theory that his own required training forecloses acts, at minimum, with reckless disregard for the truth.

139. The affidavits did not establish probable cause when stripped of the false statements and corrected for the omitted material facts.

140. Ms. Tinsley suffered a deprivation of liberty as a result of the prosecution, including a seven-hour post-arrest hold, bond obligation, retention of criminal defense counsel, and the pendency of charges for approximately six and a half months.

141. The criminal proceedings terminated in Ms. Tinsley's favor on February 19, 2026, when the District Attorney filed a Motion Not to Prosecute and both charges were dismissed by nolle prosequi without conditions.

142. Tpr. Buckner and Tpr. Rohrbaugh acted under color of law by using and abusing the authority and power of their positions as THP troopers to swear out the false and misleading affidavits in furtherance of THP's quota-driven objectives without a

22

lawful basis and in violation of Ms. Tinsley's Fourth Amendment rights.

143. As a direct and proximate result of the unfounded prosecution, Ms. Tinsley suffered humiliation, reputational harm, emotional distress, loss of liberty, financial loss including attorneys' fees and bond fees, and damage to her career.

144. The actions of Tpr. Buckner and Tpr. Rohrbaugh were willful, wanton, and in reckless disregard of Ms. Tinsley's rights, entitling her to compensatory damages, punitive damages, and attorney's fees under 42 U.S.C. § 1988.

## CLAIM III: 42 U.S.C. § 1983 — UNREASONABLE SEARCH AND SEIZURE OF BLOOD IN VIOLATION OF THE FOURTH AMENDMENT
### (*Tpr. Buckner*)

145. A compelled blood draw is a search and seizure within the meaning of the Fourth Amendment.

146. Tpr. Buckner caused Ms. Tinsley's blood to be drawn at Blount Memorial Hospital on August 2, 2025, pursuant to a Search Warrant issued on the basis of his sworn Affidavit and Application for Search Warrant, which contained material false statements and material omissions, set out in the paragraphs above, that he knew to be false or that he made with reckless disregard for the truth.

147. Without those false statements and material omissions, the Affidavit and Application for Search Warrant did not establish probable cause to authorize the search and seizure of Ms. Tinsley's blood, rendering it unconstitutional and in violation of her Fourth Amendment right to be free from unreasonable searches and seizures.

148. Tpr. Buckner acted under color of law by using and abusing the authority and power of his position as a Tennessee Highway Patrol Trooper to procure and execute

the Search Warrant on the basis of the false and misleading Affidavit, which violated Ms. Tinsley's Fourth Amendment rights and furthered Tennessee Highway Patrol's quota-driven DUI enforcement objectives without lawful basis.

149. As a direct and proximate result of the unconstitutional seizure and search of her blood, Ms. Tinsley suffered humiliation, emotional distress, and bodily intrusion of an involuntary blood draw.

### CLAIM IV: 42 U.S.C. § 1983 — INDIVIDUAL SUPERVISORY LIABILITY FOR FOURTH AMENDMENT VIOLATIONS
#### (*Col. Perry, Lt. Col. Johnson, and Capt. Miller*)

150. Col. Perry, Lt. Col. Johnson, and Capt. Miller each held supervisory authority over Tpr. Buckner and Tpr. Rohrbaugh at all times relevant to this Complaint.

151. Through their own actions and decisions, Col. Perry, Lt. Col. Johnson, and Capt. Miller each authorized, approved, encouraged, or knowingly acquiesced in the quota-driven DUI-enforcement practices described above, which they knew were causing troopers under their command to arrest law-abiding drivers for DUI without probable cause.

152. Col. Perry, as the agency's commanding officer, authorized and oversaw the quota-driven enforcement and tracking practices described above and failed to correct troopers' wrongful DUI arrests despite his knowledge of them. Lt. Col. Johnson, who directed THP's statewide field operations and oversaw its Training Division, monitored and enforced those practices across the districts and knowingly acquiesced in them despite his knowledge. Capt. Miller, who directly supervised Tpr. Buckner and Tpr. Rohrbaugh, created and maintained the Knoxville District's DUI maps and

24

enforcement plans, pressed the troopers under his command to increase their DUI-arrest numbers, and failed to act despite knowing of Tpr. Buckner's prior wrongful DUI arrests.

153. Each defendant also knew that the troopers under his command were not trained or equipped to distinguish common prescription medications from impairing drugs and were treating drivers' disclosure of such medications as evidence of impairment, yet each failed to ensure that they were trained or corrected. In doing so, each acted with deliberate indifference to the known and obvious risk that his subordinates would arrest sober, law-abiding drivers—such as Ms. Tinsley—without probable cause.

154. The need for that training was obvious, as encounters between THP troopers and drivers taking those medications are foreseeable, recurring, and common.

155. The risk that untrained troopers would misidentify a disclosure of a common prescription medication as evidence of intoxication was obvious.

156. The personal acts and omissions of Col. Perry, Lt. Col. Johnson, and Capt. Miller described in this Claim were a direct and proximate cause of the violations of Ms. Tinsley's Fourth Amendment rights on August 2, 2025.

157. Col. Perry, Lt. Col. Johnson, and Capt. Miller each acted under color of state law by using and abusing the authority of their respective THP positions to authorize, encourage, or knowingly acquiesce in the practices described above, which caused the violation of Ms. Tinsley's Fourth Amendment rights.

158. As a direct and proximate result of the supervisory misconduct, Ms. Tinsley suffered all of the harms described in Counts I, II, and III.

## CLAIM V: TITLE II OF THE AMERICANS WITH DISABILITIES ACT — FAILURE TO PROVIDE REASONABLE ACCOMMODATION AND DISABILITY DISCRIMINATION
### (*Tennessee Highway Patrol*)

159. Ms. Tinsley is a qualified individual with a disability within the meaning of 42 U.S.C. § 12102(1). Her ADHD substantially limits one or more of her major life activities including concentrating, sustained attention, and brain function. These are protected major life activities under 42 U.S.C. § 12102(2) and 29 C.F.R. § 1630.2(i).

160. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

161. Defendant Tennessee Highway Patrol is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

162. Title II imposes an affirmative obligation on public entities to make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7).

163. Ms. Tinsley placed the Tennessee Highway Patrol on actual notice of her ADHD diagnosis and her prescribed stimulant medication at the outset of her encounter.

164. Tpr. Buckner and Tpr. Rohrbaugh faced no exigency, they had ample opportunity to provide reasonable accommodations for Ms. Tinsley's known disability.

165. Rather than provide reasonable accommodations, Tpr. Buckner and Tpr. Rohrbaugh, acting pursuant to THP's policies, practices, customs, and training failures, treated Ms. Tinsley's ADHD diagnosis and prescribed medication as evidence of

Case 3:26-cv-00943    Document 1    Filed 07/07/26    Page 26 of 30 PageID #: 26

impairment, administered field sobriety tests without modification for her disclosed disability, medication, recent injury, sleep deprivation, hunger, or anxiety, and disregarded her federal HRP medical clearance to drive on her prescribed medications.

166. Defendant Tennessee Highway Patrol failed to train its troopers on how to recognize, account for, and accommodate common neurodevelopmental disabilities and the medications used to treat them, in the context of a DUI investigation, and failed to provide alternative testing methods or procedures, including pharmacology-informed assessments, supervisory review, or medical screening, which were necessary to reasonably accommodate individuals like Ms. Tinsley who have neurodevelopmental disabilities and take prescribed medications cleared by federal medical authorities.

167. Defendant Tennessee Highway Patrol's failure to accommodate Ms. Tinsley's known disability reflect deliberate indifference to the known and obvious risks faced by disabled individuals subject to law enforcement DUI investigation.

168. Encounters between THP troopers and drivers taking prescribed ADHD medication or antidepressant medication occur on a routine basis. Despite the obvious need for accommodation and basic training, THP made none.

169. But for Defendant Tennessee Highway Patrol's failure to accommodate Ms. Tinsley's known disability, discriminatory arrest policies, and lack of training, Ms. Tinsley would not have suffered the injuries alleged in this Complaint.

170. Congress validly abrogated state sovereign immunity for Title II claims of the kind asserted in this Count. 42 U.S.C. § 12202.

171. Ms. Tinsley is entitled to compensatory damages, declaratory and

27

injunctive relief, and her reasonable attorney's fees and costs under 42 U.S.C. § 12133 and 42 U.S.C. § 1988(b).

## DAMAGES

172. As a direct and proximate result of the conduct alleged in this Complaint, Ms. Tinsley suffered:

a) economic damages, including but not limited to approximately $7,500 in attorneys' fees paid to criminal defense counsel, $250 in non-refundable bond-bondsman fees, four weeks of unpaid administrative leave, and approximately six months of lost five-percent higher-clearance pay differential at the Y-12 National Security Complex;

b) reputational harm and damage to her standing in her community, her workplace, and her church community;

c) loss of liberty during the seven-hour booking and hold at the Blount County Jail;

d) mental suffering and emotional distress, including ongoing fear and anxiety regarding the potential loss of her federal employment and security clearance, and ongoing fear and anxiety triggered by interaction with or observation of Tennessee Highway Patrol vehicles;

e) humiliation, including from the booking process, the supervised drug-testing protocol Ms. Tinsley was required to undergo at Y-12 as a condition of returning to work, and the approximately 14 hours of

28

online alcohol and drug-abuse education classes that Y-12 required as a condition of her return;

f) loss of enjoyment of life; and

g) the bodily intrusion of an involuntary blood draw conducted pursuant to a search warrant procured by false affidavit.

173. Based on the intentional, knowing, willful, or reckless misconduct alleged in this Complaint, Ms. Tinsley requests an award of punitive damages against Tpr. Buckner, Tpr. Rohrbaugh, Col. Perry, Lt. Col. Johnson, and Capt. Miller, in their individual capacities. Punitive damages are not sought against Defendant THP.

**REQUEST FOR RELIEF**

Based upon all the foregoing, Plaintiff Lauren A. Tinsley requests:

I. Process be issued and that each Defendant be required to respond within the time provided by the Federal Rules of Civil Procedure;

II. A jury be empaneled to try this case;

III. That Ms. Tinsley be awarded nominal damages on Counts I, II, III, and IV;

IV. That Ms. Tinsley be awarded compensatory damages on each Claim against the defendants named in that Count;

V. That Ms. Tinsley be awarded punitive damages against Tpr. Buckner, Tpr. Rohrbaugh, Col. Perry, Lt. Col. Johnson, and Capt. Miller, in their individual capacities, in an amount to be determined by the jury, for their intentional or reckless violations of her federally protected constitutional rights;

VI. That Ms. Tinsley be awarded reasonable attorney's fees, costs, and expenses

29

under 42 U.S.C. § 1988 and 42 U.S.C. § 12133;

VII. For pre- and post-judgment interest on all damages awarded; and

VIII. For such other, further, and general relief as the Court deems just and appropriate.

Respectfully submitted,

**BRAZIL CLARK, PLLC**

*s/ Wesley Ben Clark*
Wesley Ben Clark, #32611
Frank Ross Brazil, #34586
Paul D. Randolph, #39667
760 E Argyle Ave.
Nashville, TN 37203
615-730-8619
wesley@brazilclark.com
frank@brazilclark.com
paul@brazilclark.com

30